UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VIVIAN LAWRENCE, | ) |
| Plaintiff, | ) |
| | ) No. 18 C 7128 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| ZIONSOLUTIONS, LLC, | ) |
| Defendant. | ) |

**OPINION AND ORDER**

In September 2017, Defendant ZionSolutions, LLC ("Zion") transferred Plaintiff Vivian Lawrence, an African American female laborer, and the remainder of her laborer team to a subcontractor. Lawrence subsequently filed this lawsuit against Zion, alleging race and sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.[1] Zion has now moved for summary judgment on all of Lawrence's claims.[2] Because no reasonable juror could conclude that Lawrence's race, sex, or protected activity caused Zion to terminate her employment and transfer management of her laborer position to a subcontractor, Lawrence's discrimination and retaliation claims cannot survive summary judgment.

---

[1] Section 1981 applies only to Lawrence's claims of race discrimination and retaliation, not those based on her sex. *See Runyon v. McCrary*, 427 U.S. 160, 167–78 (1976).

[2] After the close of fact discovery, Lawrence sought to amend her complaint to add additional claims for race- and sex-based harassment, as well as intentional and negligent infliction of emotional distress. Doc. 77. The Court denied the motion, finding that allowing Lawrence to add additional claims after the close of fact discovery would prejudice Zion. Doc. 82. Although Lawrence's amended complaint includes some allegations concerning sex-based harassment, nowhere in her response to Zion's summary judgment motion does she argue that she has any claims aside from those for discrimination and retaliation, nor does she contend that the Court should consider the allegedly hostile work environment as an adverse employment action. Therefore, the Court treats Lawrence as having abandoned any potential harassment claim she may have asserted in her amended complaint.

BACKGROUND

I.     **Preliminary Matters**

As an initial matter, the Court must address Zion's request that the Court strike certain additional facts proposed by Lawrence in her response. This Court's summary judgment procedures differ from Local Rule 56.1, in that this Court requires the parties to submit a joint statement of undisputed facts. Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==; *see Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment procedures). The party opposing summary judgment may submit additional facts it contends demonstrate a genuine issue of material fact in its response, providing citations to supporting material. *Id.*

In connection with her response, Lawrence submitted a declaration with additional facts about her employment with Manafort Brothers, Inc. ("MBI"), among other things. Zion argues that the Court should strike Lawrence's declaration because it contradicts her deposition testimony and the parties' Joint Statement of Undisputed Facts. "[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). But the Court disagrees that Lawrence's affidavit contradicts her deposition testimony with respect to her job duties when working for MBI given that the parties did not explore this topic during her deposition. True, Zion's counsel did ask Lawrence whether any of the other laborers on her team returned to work at Zion, but her declaration clarifies instead of contradicts that question and her subsequent answer. *See id.* at 317 ("We also allow the submission of a supplemental affidavit that clarifies ambiguous or confusing deposition testimony.").

2

Whether Lawrence's affidavit contradicts the facts to which the parties stipulated in the Joint Statement of Facts gives the Court greater pause. Lawrence represents that she understood the use of direct quotes from a deposition or declaration to represent only what the deponent or declarant stated, leaving open the possibility for her to provide evidence contradicting these statements in her response. The Joint Statement does not clearly reflect this understanding. Nonetheless, the Court finds it better to resolve this motion based on a complete record and not exclude evidence based on a technicality, particularly where Lawrence's declaration does not directly contradict the agreed upon facts. Therefore, the Court considers her declaration in full and treats those facts in the Joint Statement that involve solely direct quotes to represent an agreement only as to what the deponent or declarant stated.

## II.     Facts[3]

### A.     Scope of Zion's Work

Zion was hired to disassemble and decommission the site of a nuclear power plant in Zion, Illinois. Zion hired Lawrence as a general laborer in 2013 to work on the project. Lawrence's job duties included setting up areas for nuclear technicians to work, carrying equipment for the technicians, cleaning sites and restrooms, taking out trash, and other physical labor tasks that supported the plant's demolition and decontamination.

Given the nature of the work, Zion employees understood that their jobs would end upon the decommissioning of the plant. Indeed, Lawrence acknowledged that she "ask[ed] [her supervisors] everyday, how long do we have" because "[e]verybody kn[ew] . . . that the job

---

[3] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts and the additional facts submitted by Lawrence in her response. The Court has addressed Zion's objections to the additional statements of fact and supporting exhibits above. The Court includes in this background section only those facts that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. The Court takes all facts in the light most favorable to Lawrence, the non-movant.

w[ould] end." Doc. 94 ¶¶ 7–8. In 2014, due to lack of work at the plant, Zion laid off Lawrence and forty-one additional employees. But as work increased again later that year, Zion rehired Lawrence.

By early 2016, Zion had completed the majority of the work on the plant. Only seventeen percent of the project remained outstanding in May 2016, mostly involving the final specialist-based nuclear surveying and testing portion. As Zion completed its work, the number of employees at the plant steadily decreased and Zion "actively look[ed] for [additional] ways to reduce staff." *Id.* ¶ 13.

### B. Transition of Laborer Jobs to MBI

In connection with its desire to decrease staff and the winding down of the project, Zion's senior management began to consider transitioning all labor work to MBI in 2015. Zion believed that it had "lost so much money" on "direct hire" because it was less efficient at managing laborers than MBI, predicting that the work would be completed twice as fast if MBI, and not Zion, managed the laborers. *Id.* ¶ 20. In other words, Zion wanted to manage the scientists and technicians involved in the decommissioning of the plant and not the laborers. Zion brought on Bob Quinn to effectuate the change, with Zion agreeing in June 2016 to subcontract part of the demolition and remediation work to MBI. This meant that Zion laid off much of its laborer staff, with MBI promptly reemploying the majority. With respect to laborers, Zion employed ninety-nine laborers in the first quarter of 2016, which decreased to fifteen by the first quarter of 2017 and ultimately to zero in the fourth quarter of 2017. After the initial transfer, Quinn testified that Zion saw immediate productivity gains of forty percent.

Although Zion transferred the majority of labor management at the plant to MBI, it continued to directly employ the Final Status Survey ("FSS") laborer team on which Lawrence

4

worked. Zion's management team agreed to keep on the FSS laborers after the FSS group head made the case that the FSS laborers had specialized skills necessary to support the FSS team specialists. Nonetheless, Zion's management team considered this arrangement temporary and continued to discuss sending the FSS labor scope of the contract to MBI.

In late 2016, MBI missed several scheduling incentive deadlines, prompting delays that continued into spring 2017. MBI submitted change orders to Zion and projected to be overbudget. In early 2017, Zion forecasted that the FSS laborers' work would end in September 2017, a projection that continued through June 2017 despite the MBI delays. In July 2017, because Zion had pushed back various deadlines and targets due to MBI's delays, Zion changed the FSS laborers' planned end date to July 2018. Zion had not anticipated carrying the cost of the FSS laborers through another year.

In mid-August 2017, Chris Keene took over as the vice president of radiological operations and so assumed management of the FSS team. Although Keene's predecessor had advocated for keeping the FSS laborers as direct Zion employees, Keene decided to revisit that decision because he believed that Zion should focus on the science side of the work and transition the remaining laborers to MBI. After Keene observed the FSS laborers working in the field, he testified that he "could not identify anything that [he] would have deemed a special skill set that any of the other laborers under the subcontractor could not perform." *Id.* ¶ 58. Keene also knew that, as the project wound down, the FSS work would ramp up and require additional laborers. As a result, Keene believed that it would better serve Zion if MBI, which already supervised the remaining laborers working on the project and could thus better shift workers around as needs changed, took over direct supervision of the FSS laborers. Zion's management team agreed with Keene's evaluation. Thus, Keene decided in late August 2017 to transfer the

5

FSS labor scope of work to MBI. In addition to transferring the scope of work, Keene and MBI agreed that MBI would hire the four FSS laborers, including Lawrence. On August 29, 2017, Keene sent Melanie Felix, Zion's human resources representative, an email memorializing the decision:

> I plan on laying off the 4 FSS laborers on 09/07/2017, Vivian, Rudy, Angelo and Tony. They will be immediately picked up by MBI and report to them going forward. They will all 4 continue to work onsite; however, their duties on a daily basis will be dictated by MBI to include continued support of FSS activities among others.

Doc. 94-1 at 24. On August 31, John Carville, MBI's project manager, sent an email to Keene and Quinn, in which he acknowledged his "understanding that MBI is taking over all labor as requested including FSS" and his "intent to have the four FSS laborers switch to MBI on Mon the 11th of Sept. if they so desire." Doc. 94-4 at 7. The next week, Zion notified the FSS laborers, including Lawrence, that MBI would manage their roles going forward and that they could continue with MBI if they wished. The entire team agreed and started with MBI on September 11 without missing any regularly scheduled days of work. After the FSS laborers' transfer to MBI, Zion did not directly employ any laborers.

According to Carville, upon the transfer to MBI, Lawrence "remained in the same role as laborer" and "her work involved general laborer responsibilities including some of the same types of tasks in the same location with the same or similar laborer employees as her work the previous weeks with Zion." Doc. 94 ¶ 71. At MBI, Lawrence worked a forty-hour week, consisting of four ten-hour days, and had the possibility of overtime. Her pay remained the same, although the check now came from MBI, not Zion, and she ultimately made more money at MBI because of extra overtime.

6

According to Lawrence, however, her job experience changed once she moved to MBI. Although the FSS laborers worked in pairs at Zion, she had to work alone for MBI. She also stated that MBI did not give her the same level of work as she had at Zion, causing her to miss out on gaining additional experience and skills. Instead of doing the skilled work she previously performed while employed by Zion, such as gridding, surveying, taking down duct work, and clearing fields, Lawrence represented that she performed only menial tasks under MBI's supervision, such as monitoring gates, ensuring no fires started, and picking up non-hazardous objects. This contrasted to the experience of other former FSS laborers, whom Lawrence recalled working with FSS nuclear technicians on more occasions than she did. Ultimately, MBI laid Lawrence off in January 2018.

C.     **The CPR Dummy Incident**

On August 1, 2017, before Zion transferred her position to MBI, Lawrence encountered a darker-skinned CPR training dummy with a mop used for dreadlocked hair and a hard hat, which she believed was dressed to resemble her. Lawrence also testified that, at some point, someone added glasses to the dummy similar to those Lawrence wore. The dummy had in its lap a magazine with a gun on its cover, with the barrel of the gun pointed at the dummy. Lawrence reported finding the dummy to Felix, showed Felix a picture of the dummy, and complained that the dummy was dressed to look like her. Felix then met with site management and discussed Lawrence's report. She also met with the oversight team and informed them of the incident, that Lawrence was upset about it, and that it should not happen again.

Several days later, on August 5, Lawrence's car had a flat tire, which the mechanic indicated was caused by someone slashing it. Even though the flat occurred two days after Lawrence was last at work, she had begun to hear a sound immediately after she left work,

7

suggesting to her that someone at work had slashed the tire. When Lawrence told Keene about the tire, he paid for the repair cost out of his own pocket. Later that week, Lawrence told Felix that coworkers had learned of her complaint about the dummy and treated her poorly in response. Lawrence also told Felix about the tire incident and other prior instances of harassment, though she did not provide specific names, details, or dates.

After Lawrence reported the dummy incident, Zion gave Lawrence a week off with pay while it investigated further. Felix conducted formal interview of laborers, though they did not begin until the week of August 21, after Zion received a letter from Lawrence's attorney concerning the alleged discrimination and demanding an investigation. The laborers Felix interviewed indicated they suspected someone had been going through their trailer after hours and so intended for the dummy to scare that person. Zion did not definitively conclude that the CPR dummy was dressed to resemble Lawrence. But after Zion completed its investigation, Lawrence did not experience any similar incidents.

Keene testified that when he made the decision to transfer the FSS laborers to MBI, he knew of Lawrence's complaint about the CPR dummy, but he did not know of any allegations of sex- or race-based harassment. He testified that the dummy incident did not play a role in his decision to transfer the FSS labor work to MBI.

### D. EEOC Charges

Lawrence filed a discrimination charge with the EEOC on August 30, 2017, complaining of race and sex discrimination and retaliation. On September 13, 2017, she filed a second EEOC charge, complaining that after she filed her first charge, Zion terminated her under pretext. Lawrence testified that if she had never filed her first charge, she believes she would have

continued working for Zion. The EEOC dismissed Lawrence's charges and issued her a notice of right to sue on July 24, 2018. This lawsuit followed.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

**I.	Race and Sex Discrimination**

First, Zion argues that Lawrence cannot prevail on her race and sex discrimination claims.[4] Title VII makes it an unlawful employment practice "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or sex." 42 U.S.C. § 2000e-2(a)(1). Courts previously spoke of proceeding under an indirect or direct method to establish discrimination, but the Seventh Circuit has instructed that instead of using such tests, the Court should consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). This does not mean that the Court cannot consider the traditional burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which Zion frames its argument. *See Ortiz*, 834 F.3d at 766 (noting that its decision does not overrule *McDonnell Douglas*). But because Lawrence clarifies in her response that she does not seek to use *McDonnell Douglas'* burden-shifting test to prove her claim, the Court only considers the evidence as a whole in addressing whether a reasonable factfinder could find that Lawrence's race or sex caused her to suffer an adverse employment action. *See id.* at 765–66.

**A.	Adverse Employment Action**

Before delving into the causation question, however, the Court must first address whether Lawrence suffered an adverse employment action. For purposes of a discrimination claim, an

---

[4] The Court uses the same framework for Lawrence's Title VII and § 1981 claims and so analyzes them together. *See Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016) (analyzing Title VII and § 1981 claims under the same framework).

adverse employment action involves "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (alteration in original) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). Adverse employment actions generally fall into three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011).

Zion argues that Lawrence did not suffer any adverse employment action because it merely shifted the management of Lawrence's job from Zion to MBI, with all the remaining aspects of her job staying the same. Lawrence disagrees, presenting her declaration that her job duties changed significantly after beginning to work under MBI's supervision. But Lawrence's job duties at MBI are not at issue here; Lawrence has not brought suit against MBI, accused MBI of any type of discrimination or retaliation, or argued that MBI functions as an extension of Zion. Instead, the Court must consider what happened to Lawrence's employment at Zion. And although MBI brought Lawrence on as a laborer to continue working on the project, the change in Lawrence's employer does not equate to an internal reassignment or transfer, for which the Court would have to examine Lawrence's duties to determine whether a significant alteration in those duties occurred. *See O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) ("By definition, any lateral job transfer will result in changes to an employee's job responsibilities and work conditions. To sustain a federal employment discrimination suit, a plaintiff must show

11

something more than the ordinary difficulties associated with a job transfer."). Instead, Zion terminated Lawrence's employment. Because termination is the quintessential adverse employment action, *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 678 (7th Cir. 2010), the Court proceeds to consider the causation question.

B.   **Causation**

Zion also argues that no reasonable factfinder could find that Lawrence's race or sex caused her to suffer an adverse employment action.[5] Lawrence may demonstrate causation through evidence of, for example, comments or animus toward her protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretextual reasons given for her termination. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

Lawrence focuses on pretext, arguing that Zion's stated reason for transferring the FSS laborers to MBI—exiting the laborer management business—lacks credence. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). Lawrence can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' [her] termination, or indirectly by showing that [Zion's] explanations are 'unworthy of credence.'" *Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (citation omitted). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *see also Stewart v. Henderson*, 207 F.3d 374,

---

[5] Although Title VII requires a showing only that the proscribed factor was a "motivating factor" in the adverse employment action, 42 U.S.C. § 2000e-2(m), § 1981 requires but-for causation, *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, --- U.S. ----, 140 S. Ct. 1009, 1017–19 (2020). The parties do not address the different causation standards or even address the fact that Lawrence proceeds under both Title VII and § 1981 for her race discrimination claim. The Court therefore addresses the causation arguments together under the mixed motives standard for purposes of summary judgment only.

378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

Here, Zion began transitioning all laborers to MBI in 2016, actively looking for ways to reduce staff as the project wound down. Although Zion employed ninety-nine laborers in the first quarter of 2016, by the third quarter of 2017, only twelve remained employed directly by Zion. Zion management believed it was less efficient at managing its laborers than MBI and chose to focus on managing the scientific and technical personnel required to complete the project. Indeed, Quinn testified that Zion saw immediate productivity gains after transferring the bulk of the labor work to MBI. And although Zion initially agreed to retain the FSS laborers, the record reflects that Zion had ongoing discussions with MBI about transferring the FSS laborers to MBI in 2016 and 2017. Ultimately, when Keene took over management of the FSS team in August 2017, these discussions accelerated, driven by the fact that the FSS laborer work was going to extend beyond its anticipated September 2017 end date and Keene's belief that the FSS laborers did not have any specific skills to warrant keeping them under Zion's direct supervision. In line with Zion's intention to exit the labor management business, Keene determined that it did not make business sense for Zion to continue to manage the FSS laborers beyond September 2017. While Lawrence may disagree with this rationale, the Court does not sit as a "super personnel department that second-guesses employer's business judgments." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted) (internal quotation marks omitted); *see Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair.").

Lawrence nonetheless argues that a reasonable juror could find that Zion's stated reason for her termination is a lie. She maintains that the timing is suspicious, coming on the heels of the CPR dummy incident. And she contends that Zion undertook a sham investigation of that incident, suggesting that Zion had it out for her. Finally, she maintains that Zion continued to use MBI laborers to help with the FSS team, suggesting that Keene's evaluation of the specialized skills of the FSS team was disingenuous. But Lawrence does not dispute that Zion had begun the process to transfer management of the project's laborers to MBI over a year before the CPR dummy incident. She also cannot dispute that, by August 2017, the only person who had advocated for keeping the FSS laborers under Zion's direct control no longer had a say in the decision and that management at that time determined that it did not make financial sense to retain a small team that could provide the same services while under MBI's management. Although Lawrence questions Keene's assessment of the FSS laborers' skills, the pretext inquiry does not consider the accuracy of the employer's stated reasoning. *Stewart*, 207 F.3d at 378. After transferring the FSS laborers to MBI, Zion never again directly hired any laborers, further undermining any argument that Zion's stated reason was pretext for discrimination. *See Chatman v. Bd. of Educ.*, 5 F.4th 738, 747 (7th Cir. 2021) (defendant's complete elimination of the position at issue supported its budgetary reason for not hiring plaintiff). Lawrence's experience at MBI, including allegedly receiving inferior jobs, has no bearing on whether Zion acted pretextually in terminating her and the remaining FSS laborers. And Lawrence has not explained how the allegedly sham investigation that Zion conducted undermines the honesty of Zion's explanation for the decision to move management of all laborers to MBI. Ultimately, Lawrence only challenges the validity and reasonableness of Zion's explanation, which does not matter in the pretext analysis. *See Seymour-Reed v. Forest Pres. Dist.*, 752 F. App'x 331, 335

(7th Cir. 2018) ("[A] pretext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness."). Because Lawrence has not identified a question of fact as to whether her race or sex caused her termination, the Court finds that she cannot prevail on her race and sex discrimination claims.

## II. Retaliation

Zion also argues that Lawrence cannot succeed on her claim that Zion retaliated against her in response to her complaints about the CPR dummy incident and her EEOC complaint. To succeed on her retaliation claim, Lawrence must establish that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal link exists between her protected activity and the adverse action. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016); *see Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (applying the same standards for Title VII and § 1981 retaliation claims). Zion challenges all three elements.

### A. Protected Activity

"An employee engages in a protected activity by either: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). Lawrence claims she engaged in protected activity when she complained to Felix about the CPR dummy on August 1, 2017 and when she filed her EEOC Charge on August 30, 2017. Zion argues that neither action can support her retaliation claim here.

First, with respect to the August 1 complaint about the CPR dummy, Zion contends that Lawrence did not sufficiently identify that the harassment occurred because of her sex or race.

15

"Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *see also Cole v. Bd. of Trs.*, 838 F.3d 888, 901 (7th Cir. 2016) (statutorily protected activity "requires more than simply a complaint about some situation at work, no matter how valid the complaint might be"). But here, at least a question of fact exists as to whether Lawrence's complaint to Felix sufficiently provided facts that would give rise to an inference that Lawrence complained of race- or sex-based harassment. Lawrence complained to Felix that the CPR dummy looked like her, showing Felix a picture of the dummy. The picture shows a dark-skinned, dreadlocked female laborer. Lawrence also specifically complained to Felix about the mop's use to resemble dreadlocked hair similar to hers. Although Lawrence did not use the words "race- or sex-based harassment," a reasonable juror could conclude that Lawrence complained of just that and not simply a personal insult. *Cf. Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) ("Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue.'" (alteration in original) (quoting *Miller v. Am. Family Mutual Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000)). Although Keene testified he did not know that Lawrence complained specifically of race- or sex-based harassment, at least a question of fact exists on this question.

As for the August 30, 2017 EEOC charge, Zion does not dispute that an EEOC charge generally constitutes protected activity but instead argues that, in this case, Zion made the decision to transfer the FSS laborers before learning of Lawrence's charge. Indeed, Keene sent an email to Felix on August 29 informing her of his plan to lay off the FSS laborers on

16

September 7, 2017, with MBI immediately picking up their jobs. But Lawrence argues that because Zion actually terminated her after she filed the EEOC charge, the EEOC charge may constitute protected activity. Because Zion's argument is better considered in connection with the causation question, the Court addresses it there, at this point assuming that a reasonable juror could find that the EEOC charge constituted protected activity.

## B. Adverse Employment Action

The standard for showing an adverse employment action for a retaliation claim is lower than that for a discrimination claim. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). "[A] plaintiff must only show that the employer's action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." *Chaib v. Indiana*, 744 F.3d 974, 986–87 (7th Cir. 2014) (quoting *White*, 548 U.S. at 68), *overruled on other grounds by Ortiz*, 834 F.3d 760. Here, the lower standard does not make a difference. As the Court already discussed in connection with Lawrence's discrimination claims, the record supports the conclusion that Zion terminated Lawrence's employment, which constitutes an adverse employment action for purposes of both discrimination and retaliation claims.

## C. Causation

Lawrence's retaliation claims require but-for causation, meaning "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). As with Lawrence's discrimination claims, the Court considers the entirety of the evidence to determine whether a causal link exists between her protected activity and termination. *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (applying *Ortiz* to retaliation claim). Lawrence may establish a causal link through an admission of discriminatory animus or "suspicious timing,

ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).

Initially, the Court agrees with Zion that no reasonable juror could find that Lawrence's EEOC charge was the but-for cause of her termination. While the actual layoffs did not occur until September 7, Lawrence does not point to anything in the record that would allow the inference that Zion made its decision to lay off the FSS laborers only after learning of Lawrence's EEOC charge. Instead, the record reflects that Keene made the decision to lay off the FSS laborers at least the day before Lawrence filed her EEOC charge, negating any type of causal connection between the two. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014) (no causal connection in a retaliation claim where the adverse action occurred before the employee's protected activity); *Durham v. FreshRealm, LLC*, No. 19-cv-04902, 2021 WL 3089128, at *15 (S.D. Ind. July 22, 2021) (no causal connection where the plaintiff did not provide any evidence to disprove the defendant's timeline that it decided to terminate the plaintiff before receiving his EEOC charge); *Nelson v. Potter*, No. 05 C 3670, 2007 WL 1052490, at *11 (N.D. Ill. Apr. 2, 2007) ("By contacting the EEO, Mr. Nelson did not obtain immunity from an employment decision that already had been made.").

Thus, the Court turns to whether Lawrence has presented evidence from which a reasonable juror could find a causal connection between her August 1 complaint about the CPR dummy and her termination. A juror could find the timing suspicious, but this alone does not create an inference of causation. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) ("[A] short gap [between the protected activity and adverse action] 'may permit a plaintiff to survive summary judgment' only if 'there is also other evidence that supports the inference of a

18

causal link.'" (quoting *Lang v. Ill. Dep't of Children & Fam. Servs.*, 361 F.3d 416, 419 (7th Cir. 2004)). And although "the dispositive question remains whether a reasonable jury could find a but-for causal link between the protected activities and adverse actions at issue," because Zion "has presented non-retaliatory reasons for [its] conduct, the true question is whether the proffered reasons were pretext for retaliation." *Burton v. Bd. of Regents*, 851 F.3d 690, 697 (7th Cir. 2017). The Court's pretext analysis with respect to Lawrence's discrimination claims applies equally here and precludes a finding that her complaint about the CPR dummy served as the but-for cause of her termination.[6] *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018) (adopting pretext analysis from discrimination claim for retaliation claim). Therefore, Lawrence cannot prevail on her retaliation claims, requiring the Court to enter judgment for Zion.

## CONCLUSION

For the foregoing reasons, the Court grants Zion's motion for summary judgment [89]. The Court enters judgment for Zion on Lawrence's amended complaint. Case terminated.

Dated: October 27, 2021

_____
SARA L. ELLIS
United States District Judge

---

[6] The same would apply with respect to the EEOC charge if any evidence suggested that Zion made its final decision to terminate her after she filed that charge.